# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

HADER SECURITY &
COMMUNICATIONS SYSTEMS LLC,
a United Arab Emirates limited liability
company,                                        Case No. _____

      Plaintiff,

vs.

MIRABILIS CORPORATION d/b/a
SIKUR, a Florida corporation,

      Defendant.

_____ /

## COMPLAINT
### (Trial by Jury)

Plaintiff, Hader Security & Communications Systems, LLC, a United Arab Emirates limited liability company, by and through its undersigned counsel, and pursuant to the Federal Rules of Civil Procedure, hereby sues Mirabilis Corporation d/b/a SIKUR, a Florida corporation, and states:

## Nature of the Action

1.     The Plaintiff brings this lawsuit against the Defendants for Breach of Contract, Breach of Warranty under the Florida Uniform Commercial Code, Breach of Implied Covenant of Good Faith & Fair Dealing, Violation of Florida's Deceptive and Unfair Trade Practices Act, Fraud in the Inducement under Florida common law, Fraudulent Misrepresentation under Florida common law, and Breach of Warranty under the Magnuson Moss Warranty Act, 15 U.S.C. §2301.

1

## The Parties

2.      Plaintiff, Hader Security & Communications Systems LLC (hereinafter, "HSCS" or "Plaintiff"), is a limited liability company duly organized under the laws of the United Arab Emirates.

3.      Defendant, Mirabilis Corporation d/b/a SIKUR (hereinafter, "SIKUR"), is a Florida corporation having a principal place of business in Miami-Dade County, Florida.

## Jurisdiction and Venue

4.      This Court has subject matter jurisdiction over the claims in this action pursuant to 28 U.S.C. §1332 because complete diversity exists between the Parties and the amount in controversy exceeds the sum of $75,000, exclusive of interests and costs. SIKUR is a citizen of Florida and HSCS is a citizen of the United Arab Emirates ("UAE").

5.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because SIKUR resides in this District.

6.      The Court may exercise personal jurisdiction over SIKUR because SIKUR is a Florida corporation, with its principal place of business within this District at 299 Alhambra Circle, 403, Coral Gables, Florida.

## Background Facts

7.      HSCS is a turnkey solutions provider based in Abu Dhabi, UAE. HSCS today is among the largest system integrators in the UAE serving governmental clients in the security and communications sector.

8.      HSCS has built strong partnerships with international vendors from around the world allowing them to consistently introduce the latest and cutting-edge technologies in the field.

9.      HSCS has developed a strong reputation as an advisor to its clients in matters involving the acquisition and assessment of reliable communication and security systems. HSCS's clients rely upon the expertise and recommended solutions offered by HSCS.

10.     SIKUR holds itself out as a developer and provider of secure communications platforms and smartphones.  SIKUR advertises that its secure communications platforms have several functionalities, including email exchange, online chat, file storage, and voice or video calls accessed using a computer, smartphone, tablet or SIKUR's proprietary secure smartphone.

11.     Upon information and belief, Mr. Fabio Fischer is the Chief Executive Officer of SIKUR and Mr. Cristiano Kruger Iop is the President and Director of SIKUR.

12.     In early 2018, representatives of HSCS learned about SIKUR at the Mobile World Congress held in Barcelona Spain.  During this event, the representatives of HSCS met SIKUR's Chief Technology Officer, Alexandre Vasconcelos, and SIKUR's Sales Director, Gustavo Iop.

13.     Messrs. Gustavo Iop and Vasconcelos pitched SIKUR's proprietary communications platforms to HSCS.

14.     Because of the presentation by Mr. Vasconcelos and Mr. Iop, on or about March 19, 2018, SIKUR and HSCS entered into a non-disclosure agreement in order to discuss a business relationship.

15.     Initially, SIKUR and HSCS entered into negotiations regarding distribution of the SikurPhone. Under the proposed agreement, HSCS would establish a fulfillment center in Dubai for distribution of the SikurPhones.  In this scenario, SIKUR proposed that HSCS would purchase the SikurPhones in large volume. Ultimately, the parties did not enter into any distribution agreement for SikurPhones.

16.     HSCS and SIKUR continued discussions and, on or about May 29, 2018, ultimately entered into a Distribution Agreement, wherein HSCS became a "Partner" for distribution of the SIKUR platform.  The Distribution Agreement between HSCS and SIKUR is attached hereto as **Exhibit A**.

17.     The purpose of the Distribution Agreement was to "define the terms and conditions to execute a Distribution Agreement for Product to be market[ed], promoted, distributed and sold by [HSCS]." *See* Distribution Agreement, Exhibit A ¶ 3(a).

18.     As defined in the Distribution Agreement, the Product means:

> SIKURPlatform, firmware, application software and software maintenance (corrective, preventive and enhancements); SIKUR reserves the right at any time and without notice, to make changes and updates to the Product which do not adversely affect the form, fit or function of the Product. SIKUR shall be under no obligation to make such changes to any of the Products previously shipped to the PARTNER, but shall make available online updates to the products, at Company's sole discretion.

*See* Distribution Agreement, Exhibit A at 1.

19.     Under the Distribution Agreement, HSCS was to exclusively sell the "Product" developed by SIKUR, which was a custom programmed software product adapted to work on a private server environment for the purpose of users' secure communications, within the territories listed in Exhibit C of the Distribution Agreement, including Bahrain, Cyprus, Egypt, Iraq, Jordan, Kuwait, Lebanon, Oman, Qatar, Saudi Arabia, Turkey, United Arab Emirates, Yemen, Algeria, Morocco, Tunisia, Ceuta, Melilla, and Canary Islands.

20.     SIKUR promoted its custom software "Product" as a platform that enables an end-user to securely communicate, through video and voice communications, with other persons via smartphones and other devices.  Accordingly, the custom software Product resided on a secure server as well as each end-user's device.  Each end-user was required to download an application

onto the person's smartphone or other mobile device that would allow secure, encrypted communications between the various end-users via the secure server.  For this reason, SIKUR's custom software Product was required to be operable on a secure server that the customer could maintain at its chosen location rather than on a third-party cloud-based server.

21.     The parties contemplated, based on the Distribution Agreement, that HSCS would achieve certain sales goals to maintain its exclusive sales rights as a distributor. For example, from May 2018 to May 2019, HSCS was to purchase 2500 licenses.  For each quarter thereafter, through March 2021, HSCS was to purchase 375 licenses.  Distribution Agreement, Exhibit A at 15.

22.     Under SIKUR's Product Warranty, as defined in the Distribution Agreement:

> SIKUR warrants to Partner that for 1(one) year from the date of delivery, each Product sold hereunder will be free of defects in materials or workmanship and will conform to specifications.

*See* Distribution Agreement, Exhibit A at 1.

23.     HSCS and SIKUR also entered into a Private Cloud Project agreement on or about December 12, 2018.  The Private Cloud Project agreement between HSCS and SIKUR is attached hereto as **Exhibit B**.

24.     The purpose of the Private Cloud Project agreement was to "define the rules to develop a project to adapt the current system SIKURPlatform to work on a private cloud environment."  Private Cloud, Exhibit B at 1.

25.     HSCS was required to pay for each phase of the Project under the Private Cloud Agreement.

26.     Implementation of the project commenced on December 2018, with a target completion date of August 2019.

27.     Under the agreement between the parties, HSCS was required to provide a Microsoft Azure development environment to SIKUR so that SIKUR's software developers could create the custom Product solution.

28.     Accordingly, HSCS contracted with Microsoft to provide the development environment, expending considerable resources throughout the period during which SIKUR attempted to create the custom Product solution.

29.     HSCS has continued to maintain the Microsoft Azure development environment through the present day in order to preserve the custom Product solution in its current state.

30.     Unfortunately, the custom Product delivered by SIKUR never functioned properly and crashed repeatedly, rendering the Product useless to HSCS and its business partners and end-users.

31.     Under the private cloud agreement, SIKUR was to provide the platform Product, allowing HSCS to select the manner in which the program was presented through the user-interface, including the name of the Product.  HSCS selected the name CIFRA$^{TM}$ for the entire Product to be provided by SIKUR.

32.     On November 25, 2019, HSCS notified SIKUR that it was not able to access CIFRA$^{TM}$ and provided feedback relating to a test session of CIFRA$^{TM}$.

33.     On November 26, 2019, SIKUR responded, provided a new link to access CIFRA$^{TM}$, and explained that its operations team was dealing with R&D to set privileges and priorities for controlling what each department within the HSCS organization could access.

34.     Continuing through, to the following year, the Product failed to work properly, and HSCS identified several issues and SIKUR did not resolve the issues.  SIKUR was unable to

provide a functioning Product and merely reassured HSCS that the platform just needed to be tested and debugged.

35.     By way of example, in December 2019, HSCS informed SIKUR that its users were experiencing voice interruption.

36.     SIKUR, never resolving the voice interruption issue, merely responded via email that the voice interruption issue may be due to the local telecommunications provider.

37.     Later, on December 18, 2019, SIKUR requested that HSCS accept the Project, by signing a Project Acceptance Term.  HSCS, however, refused to sign such acceptance, rejecting the Project on the basis that the system was not functioning properly but providing SIKUR yet another opportunity to correct the Product's defects.

38.     On January 10, 2020, HSCS informed SIKUR that the platform did not receive push notifications from the chat function.

39.     On February 27, 2020, months after HSCS informed SIKUR of the voice interruption issue identified in December 2019, SIKUR concluded that such issue was related to the local telecommunications provider. A few weeks later, on March 9, 2020, SIKUR proposed to discuss the solution to the block imposed by the local telecommunications provider.

40.     Again, on April 28, 2020 HSCS informed SIKUR via email that HSCS' customer reported "instability and crashes that occur on the [A]pp." The following screenshots were taken on or about April 28, 2020:



a.



b.



c.

41. On April 29, 2020, SIKUR responded via email to HSCS that "Sikur is working

hard in the last months rewriting the Sikur Messenger code from scratch, adding new features,

fixing known BUGS. . .The new Messenger (Cifra for you), will be 100% updated in July/20, all the bugs you sent us will be fixed."

42.     On November 10, 2020, HSCS again informed SIKUR that the Product did not reach delivery status because it was "riddled with bugs."  In an email communication, HSCS lists just some of the unresolved issues it was experiencing at that time, as summarized below:

a.     Not receiving calls on iPhone 7+;

b.     Delayed notifications;

c.     Sometimes no notifications on other iPhones;

d.     Glitch that makes all chats unread for a brief second;

e.     Invite requests not being received;

f.     Fingerprint authentication is too slow;

g.     Receiving message from a new contact, circle on the left where usual name abbreviation is blank;

h.     When you click on the chat the app freezes;

i.     During video call, the screen starts to dim when the call progresses, then locks on its own. When unlocking the phone, the call screen and video disappear and there is no way to bring back the call or video screen;

j.     Upon logging in, the message to "allow fingerprint" should also say "or "facial recognition" because the newer iPhone models don't have fingerprint, only facial recognition as the opposite applies to the older models like my iPhone7+; and

k.     When you are trying to make a call it doesn't allow you because it says there is a call in progress, phone has to be restarted.

43.     On the same day, SIKUR responded that "[d]elivery is a process . . . [o]ur goal is to deliver a working App, ready for sales and revenue generation" and requested to test the issues listed in HSCS's November 10, 2020 email.

44.     Accordingly, by its own admission, SIKUR did not perform its contractual obligation of having a Product ready for sales and revenue generation by December 2019.

45.     On November 15, 2020, HSCS informed SIKUR again that the APP does not work and is "riddled with bugs and is unusable, rendering the full delivery . . . **incomplete**." (emphasis in original).

46.     At that time, the total amount that HSCS had paid to SIKUR amounted to more than $500,000.00.

47.     Holding HSCS to sales projections that were impossible to meet due to the defective Product, SIKUR then threatened to terminate HSCS' status as an "exclusive" distributor.

48.     After over two years of trying to resolve multiple issues with the Product with SIKUR, HSCS through its counsel demanded its money back, in accordance with the terms of the parties' agreements. The demand letter, dated March 2021, is attached hereto as **Exhibit C**.

49.     In response, SIKUR, through counsel, claimed that it had delivered the Product in its entirety.  SIKUR's response letter is attached hereto as **Exhibit D**.

50.     HSCS, responded through counsel, once again reiterated its demand.  HSCS' response letter is attached hereto as **Exhibit E**.

51.     SIKUR, through their counsel, replied, refusing to adhere to their responsibilities under the agreements. SIKUR's reply is attached hereto as **Exhibit F**.

52.     To date, the SIKUR Product does not work and SIKUR has not returned the $535,354.65 that HSCS has paid for its investment in the Product.

53.     HSCS has been harmed by SIKUR's inability to deliver a functioning Product, including, inter alia, the loss of business partners and customers.  SIKUR has caused injury and damages to HSCS in excess of three million dollars ($3,000,000.00).

54.     All conditions precedent have occurred or been performed by HSCS.

## COUNT I – BREACH OF CONTRACT AGAINST SIKUR

55.     Plaintiff incorporates by reference the allegations of paragraphs 1 through 54 as if fully set forth herein.

56.     HSCS entered into a contract with SIKUR.

57.     HSCS paid consideration to SIKUR under the contract, but SIKUR breached the contract by failing to provide a Product that functioned.

58.     HSCS provided notice to SIKUR of the non-functional issues with the Product multiple times, and SIKUR failed to fix the problems with the Product, and thus breached its contract with HSCS.

59.     SIKUR's breach was material and rendered the remaining contractual terms between SIKUR and HSCS impossible to complete given that the Product was at the heart of the purpose of the contract.

60.     SIKUR's breach has caused HSCS to suffer damages, including, inter alia, the money HSCS paid SIKUR under the contract, the money HSCS has paid to Microsoft to provide the development platform, the loss of HSCS customers, and the inability to fulfill promises HSCS had made to its customers and business partners in its Territory under the agreements.

61.     HSCS is entitled to seek damages from SIKUR resulting from SIKUR's breach of contract.

## COUNT II – BREACH OF EXPRESS WARRANTY (FLA. STAT. § 672.313) AGAINST SIKUR

62.     Plaintiff incorporates by reference the allegations of paragraphs 1 through 54 as if fully set forth herein.

63.     HSCS paid SIKUR to develop a Product, including an application, and accordingly, HSC purchased a product from SIKUR.

64.     SIKUR provided an express warranty to HSCS that it would deliver to HSCS a Product that would function for its intended purpose of allowing HSCS's customers to securely communicate via SIKUR's Product.

65.     The contract between HSCS and SIKUR expressly provided that SIKUR would deliver the Product to HSCS.

66.     The Product that SIKUR developed and delivered failed to conform to SIKUR's promise to provide a functioning Product and application that would allow HSCS's customers the ability to securely communicate with each other through a stable application and on a platform free of bugs.

67.     HSCS has been damaged as a result of SIKUR's breach of the express warranty.

### COUNT III – BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (FLA. STAT. § 672.314) AGAINST SIKUR

68.     Plaintiff incorporates by reference the allegations of paragraphs 1 through 54 as if fully set forth herein.

69.     HSCS paid SIKUR to develop a Product, including an application, and accordingly, HSC purchased a product from SIKUR.

70.     HSCS and its customers were foreseeable users of the Product that HSCS purchased from SIKUR.

71.     HSCS attempted to use the Product on several occasions, but the Product was unstable, and riddled with bugs that rendered the Product unusable.

72.     The Product was defective when SIKUR provided it to HSCS.

73.     The Product was not fit for its ordinary purpose.

74.     The Product that SIKUR developed and delivered failed to conform to SIKUR's promise to provide a functioning Product and application that would allow HSCS's customers the

ability to securely communicate with each other through a stable application and on a platform free of bugs.

75.     The defects in the Product have caused injury to HSCS.

76.     HSCS has been damaged as a result of SIKUR's breach of the implied warranty of merchantability.

## COUNT IV – BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE (FLA. STAT. § 672.315) AGAINST SIKUR

77.     Plaintiff incorporates by reference the allegations of paragraphs 1 through 54 as if fully set forth herein.

78.     HSCS paid SIKUR to develop a Product, including an application, and accordingly, HSC purchased a product from SIKUR.

79.     SIKUR at the time of entering into the contract with HSCS for the development and sale of the Product to HSCS had reason to know the particular purpose for which HSCS purchased the Product, because, inter alia, HSCS expressly told SIKUR the purpose for which it was contracting with SIKUR.

80.     HSCS relied on SIKUR's judgment in providing a suitable Product.

81.     The Product failed to be fit for its particular purpose.

82.     The defects in the Product have caused injury to HSCS.

83.     HSCS has been damaged as a result of SIKUR's breach of the implied warranty of fitness for a particular purpose.

## COUNT V – BREACH OF IMPLIED COVENANT OF GOOD FAITH & FAIR DEALING UNDER FLORIDA LAW AGAINST SIKUR

84.     Plaintiff incorporates by reference the allegations of paragraphs 1 through 54 as if fully set forth herein.

85.     HSCS entered into a written contract with SIKUR.

86.     HSCS paid consideration to SIKUR under the contract, but SIKUR breached the contract by failing to provide a Product that functioned.

87.     HSCS had made several demands to SIKUR that it provide the Product in a functional and saleable condition, but SIKUR had failed to do so.

88.     SIKUR, even after being put on notice of the non-functional issues with the Product, failed to fix the problems with the Product, and thus breached its contract with HSCS.

89.     As a result, HSCS has demanded that SIKUR return its money, which SIKUR has refused.

90.     In response to HSCS's demands for reimbursement, SIKUR has alleged that it provided the Product to HSCS and that the unstable platform and bugs are simply imperfections that HSCS has to learn to accept as part of the process.

91.     The aforementioned problems with the Product were never disclosed to HSCS or identified in the contract between HSCS and SIKUR, and have made it impossible for HSCS to fulfil its remaining obligations under the contract.

92.     SIKUR, through conscious and deliberate actions, has failed or refuses to discharge its contractual responsibilities to provide a working Product in a stable platform that unfairly frustrates the contract's purpose and disappoints HSCS's expectations.

93.     SIKUR has breached the implied covenant of good faith and fair dealing under Florida law.

94.     SIKUR's breach has deprived HSCS of the contract's benefit.

95.     SIKUR's breach has caused HSCS to suffer damages, including, inter alia, the money HSCS paid SIKUR under the contract, the money HSCS has paid to Microsoft to provide

the development platform, the loss of HSCS customers, and the inability to fulfill promises HSCS had made to its customers and business partners in its Territory under the agreements.

96.    HSCS is entitled to seek damages from SIKUR resulting from SIKUR's breach of contract.

## COUNT VI – VIOLATION OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT  FLORIDA STATUTE 501.201 ET SEQ. AGAINST SIKUR

97.    Plaintiff incorporates by reference the allegations of paragraphs 1 through 54 as if fully set forth herein.

98.    SIKUR, through its representatives, Mr. Vasconcelos and Mr. Gustavo Iop misrepresented to HSCS, SIKUR's ability to deliver a functioning, secure communications platform, including a proprietary application, which HSCS would be able to provide to its customers.

99.    SIKUR's representatives, Mr. Vasconcelos and Mr. Gustavo Iop, made false statements and representations to HSCS's Mr. Tabbara concerning the software product that they were offering to sell to Mr. Tabbara's company, including, inter alia, that the Private Cloud Software program (CIFRA$^{TM}$) would be able to work independent of SIKUR's hosted servers.

100.    These statements and representations were false, because SIKUR was unable to provide a stable and functioning Product.

101.    These statements and representations concerned material facts, because Mr. Tabbara, on several occasions told SIKUR, and Messrs. Vasconcelos and Gustavo Iop, that his company's clients needed a secure communications platform that would function through a secure, self-hosted server, such that HSCS or its designee would possess the server.

102.    These system requirements were critical not only to HSCS, but to HSCS's customers, and were essential to HSCS's ability to sell licenses to use the Product.

103.    Furthermore, Messrs. Vasconcelos and Gustavo Iop, assured Mr. Tabbara and HSCS that, if SIKUR could not deliver on the project, that SIKUR would return the development investment within 10 business days. *See* Private Cloud contract.

104.    SIKUR, through Messrs. Vasconcelos and Gustavo Iop, intended that the representations concerning the capability of their development team to program and deliver a software product that met HSCS's needs, as well as the promise of a return of HSCS's investment should they not deliver, would induce Mr. Tabbara to act on those representations and sign the contract with SIKUR.

105.    SIKUR's misrepresentations about the company's capabilities, and the company's inability to ever deliver a stable platform and substantially bug-free application, evidence SIKUR's deceptive and unfair trade practices.

106.    Upon information and belief, SIKUR had never provided a custom software Product meeting HSCS's requirements before offering the same to HSCS.

107.    Thus, SIKUR knew or should have known that the statements and representations that it made to HSCS were false.

108.    Indeed, those very representations are what induced Mr. Tabbara to sign the contracts on behalf of HSCS and to give the substantial deposit to SIKUR to start the development project.

109.    SIKUR's false statements and misrepresentations to HSCS constitute deceptive acts or unfair practices.

110.    HSCS has suffered damages as a result of SIKUR's false statements and misrepresentations.

## COUNT VII – FRAUD IN THE INDUCEMENT
## AGAINST SIKUR

111.    Plaintiff incorporates by reference the allegations of paragraphs 1 through 54 as if fully set forth herein.

112.    SIKUR, through its representatives, Mr. Vasconcelos and Mr. Gustavo Iop misrepresented to HSCS, SIKUR's ability to deliver a functioning, secure communications platform, including a proprietary application, which HSCS would be able to provide to its customers.

113.    SIKUR's representatives, Mr. Vasconcelos and Mr. Gustavo Iop, made false statements and representations to HSCS's Mr. Tabbara concerning the software product that they were offering to sell to Mr. Tabbara's company, including, inter alia, that the Private Cloud Software program (CIFRA$^{TM}$) would be able to work independent of SIKUR's hosted servers.

114.    These statements and representations were false, because SIKUR was unable to provide a stable and functioning Product and a Product that would be able to work independent of SIKUR's hosted servers.

115.    These statements and representatives concerned material facts, because Mr. Tabbara, on several occasions told SIKUR, and Messrs. Vasconcelos and Gustavo Iop, that his company's clients needed a secure communications platform, and one that would function through a secure, self-hosted server, such that HSCS or its designee would possess the server.

116.    These system requirements were critical not only to HSCS, but to HSCS's customers, and were essential to HSCS's ability to sell licenses to use the Product.

117.    Furthermore, Messrs. Vasconcelos and Gustavo Iop, assured Mr. Tabbara and HSCS that, if SIKUR could not deliver on the project, that SIKUR would return the development investment within 10 business days. *See* Private Cloud contract.

118.     SIKUR, through Messrs. Vasconcelos and Gustavo Iop, intended that the representations concerning the capability of their development team to program and deliver a software product that met HSCS's needs, as well as the promise of a return of HSCS's investment should they not deliver, would induce Mr. Tabbara to act on those representations and sign the contract with SIKUR and to give the substantial deposit to SIKUR to start the development project.

119.     Upon information and belief, SIKUR had never provided a custom software Product meeting HSCS's requirements before offering the same to HSCS.

120.     Thus, SIKUR knew or should have known that the statements and representations that it made to HSCS were false.

121.     SIKUR's misrepresentations about the company's capabilities, and the company's inability to ever deliver a stable platform and substantially bug-free application, evidence and constitute SIKUR's deceptive and unfair trade practices.

122.     Indeed, HSCS justifiably relied on SIKUR's false statements and misrepresentations in entering into the contracts with SIKUR.

123.     HSCS has suffered damages as a result of SIKUR's false statements and misrepresentations.

**COUNT VIII – FRAUDULENT MISREPRESENTATION UNDER FLORIDA COMMON LAW AGAINST SIKUR**

124.     Plaintiff incorporates by reference the allegations of paragraphs 1 through 54 as if fully set forth herein.

125.     SIKUR, through its representatives, Mr. Vasconcelos and Mr. Gustavo Iop misrepresented to HSCS, SIKUR's ability to deliver a functioning, secure communications

platform, including a proprietary application, which HSCS would be able to provide to its customers.

126.    SIKUR's representatives, Mr. Vasconcelos and Mr. Gustavo Iop, made false statements and representations to HSCS's Mr. Tabbara concerning the software product that they were offering to sell to Mr. Tabbara's company, including, inter alia, that the Private Cloud Software program (CIFRA^{TM}) would be able to work independent of SIKUR's hosted servers.

127.    These statements and representations were false, because SIKUR was unable to provide a stable and functioning Product and a Product that would be able to work independent of SIKUR's hosted servers.

128.    These statements and representations concerned material facts, because Mr. Tabbara, on several occasions told SIKUR, and Messrs. Vasconcelos and Gustavo Iop, that his company's clients needed a secure communications platform, and one that would function through a secure, self-hosted server, such that HSCS or its designee would possess the server.

129.    These system requirements were critical not only to HSCS, but to HSCS's customers, and were essential to HSCS's ability to sell licenses to use the Product.

130.    Furthermore, Messrs. Vasconcelos and Gustavo Iop, assured Mr. Tabbara and HSCS that, if SIKUR could not deliver on the project, that SIKUR would return the development investment within 10 business days. *See* Private Cloud contract.

131.    SIKUR, through Messrs. Vasconcelos and Gustavo Iop, intended that the representations concerning the capability of their development team to program and deliver a software product that met HSCS's needs, as well as the promise of a return of HSCS's investment should they not deliver, would induce Mr. Tabbara to act on those representations and sign the

contract with SIKUR and to give the substantial deposit to SIKUR to start the development project.

132.   Upon information and belief, SIKUR had never provided a custom software Product meeting HSCS's requirements before offering the same to HSCS.

133.   Thus, SIKUR knew or should have known that the statements and representations that it made to HSCS were false.

134.   SIKUR's misrepresentations about the company's capabilities, and the company's inability to ever deliver a stable platform and substantially bug-free application, evidence and constitute SIKUR's deceptive and unfair trade practices.

135.   Indeed, HSCS justifiably relied on SIKUR's false statements and misrepresentations in entering into the contracts with SIKUR.

136.   HSCS has suffered damages as a result of SIKUR's false statements and misrepresentations.

### COUNT IX– BREACH OF WARRANTY UNDER THE MAGNUSON MOSS WARRANTY ACT, 15 U.S.C. §2301, ET SEQ. AGAINST SIKUR

137.   Plaintiff incorporates by reference the allegations of paragraphs 1 through 54 as if fully set forth herein.

138.   HSCS paid SIKUR to develop a Product, including an application, and accordingly, HSC purchased a product from SIKUR.

139.   SIKUR provided express and implied warranties to HSCS that it would deliver to HSCS a Product that would function for its intended purpose of allowing HSCS's customers to securely communicate via SIKUR's Product.

140.   Furthermore, SIKUR provided express and implied warranties to HSCS that its Product would perform substantially bug-free and on a stable platform on independent servers.

141.    The contract between HSCS and SIKUR expressly provided that SIKUR would deliver the Product to HSCS.

142.    The Product that SIKUR developed and delivered failed to conform to SIKUR's promise to provide a functioning Product and application that would allow HSCS's customers the ability to securely communicate with each other through a stable application and on a stable platform substantially free of bugs.

143.    HSCS gave SIKUR notice that the Product was not functioning as promised under the warranties provided to HSCS.

144.    SIKUR had reasonable opportunities to cure the failures of the Product, but SIKUR never cured the failures.

145.    Indeed, HSCS provided SIKUR multiple opportunities to cure the failures, and SIKUR failed each time to comply with the warranties it provided to HSCS.

146.    HSCS has been damaged as a result of SIKUR's breach of the warranties.

## **JURY DEMAND**

Plaintiff demands trial by jury on all issues so triable.

WHEREFORE, Plaintiff, Hader Security & Communications Systems, LLC, demands judgment against Defendant, Mirabilis Corporation d/b/a SIKUR, and that Plaintiff be awarded:

A.    Rescission of the Distribution Agreement and Private Cloud Project agreement.

B.    Compensatory damages.

C.    Special damages.

D.    Lost profits.

E.    Attorney's Fees and Costs.

F.    Such other award as the Court deems just and proper.

Dated: May 28, 2021      By: <u>s/William R. Trueba, Jr.</u>
William R. Trueba, Jr., Esq.
Florida Bar No. 117544
<u>wtrueba@lex188.com</u>
Roberto M. Suarez, Esq.
Florida Bar No. 95762
<u>rsuarez@lex188.com</u>
TRUEBA & SUAREZ, PLLC
9100 S. Dadeland Blvd., Suite 1500
Miami, Florida 33156
Telephone:    (305) 482-1001
Facsimile:    (786) 516-2826
*Counsel for Plaintiff,*
   *Hader Security & Communications Systems, LLC*